IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 25-cv-02729-PAB-KAS

BRANDON SCHAEFER, et al.,

Plaintiffs,

v.

POLICE CHIEF JASON MOLLENDOR, in his individual and official capacities, et al.,

Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendants' Motion to Dismiss [Docket No. 31]. Plaintiffs filed a response. Docket No. 48. Defendants filed a reply. Docket No. 51. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. FACTS[1]

The Auraria Campus in Denver, Colorado is shared property that houses three educational institutions: the Community College of Denver, Metropolitan State University of Denver, and the University of Colorado Denver. Docket No. 1 at 4, ¶ 12. Tivoli Quad is a lawn on the Auraria Campus that is designated as an area for "Assembly" pursuant to Auraria Higher Education Campus ("AHEC") Policy 3.4.1 and

[1] The well-pleaded facts below are taken from the complaint, Docket No. 1, and are presumed to be true for purposes of ruling on defendants' motion to dismiss. *See Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

has long been used as a forum open to the public. *Id.* at 9-10, ¶ 28. Pursuant to AHEC Policy 3.4.1,

> Any purposeful gathering on Auraria Campus common exterior property by one or more persons whose conduct is peaceful and is in accordance with the law and AHEC rules, policies, and procedures. Assembly includes meetings, speeches, debates, demonstrations, marches, vigils, rallies, protests, and similar meetings or gatherings. For the purposes of this policy, "Assembly" does not include classes, meetings, or events held by AHEC or a Constituent Institution.

*Id.*

On April 25, 2024, protesters gathered on Tivoli Quad "to protest the Auraria colleges' support for the Israeli military." *Id.* at 10, ¶ 29. A small group of protesters, which did not include plaintiffs, established an encampment on Tivoli Quad that included tents. *Id.*, ¶ 31. Some of these protesters slept in the tents that night. *Id.*

AHEC Chief Counsel and Chief Administrative Officer Skippere Spear, and other members of the Auraria Executive Council, responded to the protests by relying on an AHEC policy that prohibited camping on the Auraria Campus (the "Camping Policy"). *Id.* at 11, ¶ 32. On April 25, 2024, Mr. Spear and other members of the Auraria Executive Council spoke with several of the protesters gathered on Tivoli Quad regarding the Camping Policy. *Id.*, ¶ 33. Mr. Spear informed the protesters that "they were welcome to gather and peacefully protest, so long as they followed the Auraria rules and did not camp overnight on campus." *Id.* Mr. Spear did not speak to plaintiffs. *Id.*, ¶ 34.

On April 26, 2024, Mr. Spear returned to Tivoli Quad and again spoke with a few protesters. *Id.*, ¶ 35. He did not speak with plaintiffs. *Id.* On both April 25 and April 26, 2024, protesters displayed banners, vocally proclaimed support for Palestine, and called

for the universities to disclose, divest from, and cease activities that support the Israeli military. *Id.*, ¶ 36.

Shortly before noon on April 26, 2026, Mr. Spear spoke with defendant Auraria Campus Police Department ("ACPD") Chief Jason Mollendor regarding the protests. *Id.* at 12, ¶ 37. Minutes after this conversation, Chief Mollendor broadcasted a message to the ACPD stating, "Chief to all units, this group has refused to acknowledge our legal counsel's request to leave. This is now an unlawful protest." *Id.*, ¶ 38.

Shortly before 12:30 p.m., Chief Mollendor and officers with ACPD, Denver Police Department ("DPD"), and the Denver County Sheriff Department arrived at Tivoli Quad. *Id.*, ¶ 40. Upon seeing the police, a group of protesters lined up at one end of Tivoli Quad facing the police. *Id.*, ¶ 41. These protesters included many individuals who had neither been involved in setting up an encampment nor slept or camped on Tivoli Quad. *Id.*

Z Williams, a community activist, approached Chief Mollendor and asked him what he planned to do. *Id.* at 13, ¶ 43. Chief Mollendor replied, "I'm about to give commands. I would highly encourage anyone who does want to get arrested to leave." *Id.* Z Williams asked if people could stay on the sidewalks. *Id.* Chief Mollendor responded, "They need to leave the campus." *Id.*

At 12:30 p.m., Chief Mollendor issued the following dispersal order:

> I am Chief Mollendor of the Auraria Campus Police Department. This assembly is in violation of DRMC 38-115 Trespass.[2] You must disperse. Failure to

---

[2] Den. Rev. Mun. Code § 38-115 provides:

> (a) It is unlawful for any person knowingly to enter or remain upon the premises of another when consent to enter or remain is absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof.

> disperse will subject each of you to arrest and prosecution. If you remain, reasonable and necessary force may be used to remove you. The following are routes of dispersal for you to peacefully leave the area: East on Larimer St, North on 11th Street, or West on Walnut Street. You have 15 minutes to leave the area. The time is 12:30.

*Id.*, ¶ 44. After this dispersal order, Z Williams again approached Chief Mollendor to seek clarification whether the legal observers, medics, students, journalists, and faculty members would also be subject to arrest. *Id.* at 13-14, ¶ 45. Chief Mollendor responded, "Everyone needs to leave the area. . . . Everyone needs to leave the campus. . . This is now an unlawful protest." *Id.*

---

> (b) It shall be prima facie evidence that consent is absent, denied, or withdrawn, to enter or remain upon the premises of another when:
>
> > (1) Any person fails or refuses to remove himself from said premises when requested to leave by the owner, occupant or person having lawful control thereof; or
> >
> > (2) Such premises are fenced or otherwise enclosed in a manner designed to exclude intruders; or
> >
> > (3) Private property or public property, which is not then open to the public, is posted with signs which give notice that entrance is forbidden.
>
> (c) For purpose of subsection (b)(3):
>
> > (1) A "conspicuous sign" shall mean a sign that is at least one (1) square foot in size and sufficiently lighted to be clear and visible and that is posted in a conspicuous location.
> >
> > (2) "Sufficient notice" that entrance is forbidden shall be established when the lettering on a conspicuous sign is at least one (1) inch in height and contains language that is substantially similar to the following: "Private property: Keep out . . . . Violators subject to arrest" or "Private property …. Violators subject to arrest between the hours of _____ and _____."

Moments later, Z Williams approached Chief Mollendor with attorney Joey Chase. *Id.* at 14, ¶ 48. Mr. Chase asked whether he and other legal observers would be permitted to remain in the vicinity. *Id.* Chief Mollendor stated that he would tell his staff "to make [legal observers] the last ones to be detained." *Id.* Chief Mollendor instructed a subordinate officer to "tell the staff: the last ones to get arrested are ones in the yellow vests because they're observers. And then the girl in the purple hair that was talking to me [an apparent reference to Z Williams] and the guy in the black shirt [an apparent reference to Mr. Chase]." *Id.*

Chief Mollendor asked a DPD officer whether officers should arrest a man who was not among the lined-up protesters and was using a bullhorn to lead the protesters in a chant. *Id.* at 15, ¶ 50. The DPD officer responded, "He's your main agitator, I would say yes. . . . If you don't remove him from the group, he's going to continue to stay and agitate." *Id.* In addition to the protester using the bullhorn, numerous other people gathered in the vicinity of the protesters standing in a line. *Id.*, ¶ 51.

At approximately 12:36 p.m., 12:41 p.m., and 12:46 p.m., Chief Mollendor repeated the dispersal orders. *Id.*, ¶ 52. Moments after the 12:36 p.m. dispersal order, the protesters standing at the edge of the encampment locked arms and sat down. *Id.* Protesters standing nearby on Tivoli Quad continued to protest peacefully. *Id.* Immediately after his 12:46 p.m. dispersal order, Chief Mollendor stated to his subordinates, "we can start arresting . . . arrest the people in the yellow vests last. Those are observers." *Id.* at 16, ¶ 53.

At approximately 12:52 p.m., police officers formed a perimeter around the encampment and began arresting the seated protesters. *Id.*, ¶ 54. At 12:55 p.m., the

police more tightly encircled the seated protesters making it impossible for any of them to leave. *Id.* The police then proceeded to arrest all of the seated protesters. *Id.* The arrests continued until approximately 2:30 p.m. *Id.* In total, the police arrested approximately 40 seated protesters, including plaintiffs. *Id.* The police did not arrest any other protesters besides the ones that were sitting. *Id.*, ¶ 55.

Before making the arrests, defendants did not identify the individuals who had camped on Tivoli Quad. *Id.* at 16-18, ¶ 56. No law enforcement officer visited the encampment the night of April 25 or in the early morning of April 26. *Id.* None of the arrested protesters were in a tent or within the encampment when the police arrived at Tivoli Quad. *Id.* Defendants did not make any efforts to ascertain who had set up the tent or camped on Tivoli Quad. *Id.* The police had unimpeded access to the encampment and could have chosen to remove the encampment, but no officer made any effort to remove the encampment. *Id.* As the police began to arrest protesters, other individuals began to dismantle the tents in view of the police. *Id.* At no time did Chief Mollendor instruct officers that removal of the tents would obviate the need to make arrests. *Id.* By no later than 1:22 p.m., defendants were aware that all tents had been removed from Tivoli Quad. *Id.* The dispersal order did not permit protesters to continue protesting elsewhere. *Id.* at 18-19, ¶ 57. Defendants filed or caused to be filed police reports stating that those arrested on April 26, 2024 were arrested because they violating the Camping Policy and were therefore trespassing. *Id.* at 20, ¶ 60.

**A. <u>Brandon Schaefer</u>**

On April 26, 2024, Mr. Schaefer went to Tivoli Quad, arriving at approximately 12:43 p.m. *Id.* at 20-21, ¶ 64. Mr. Schaefer joined the group of protesters sitting on the

lawn at approximately 12:49 p.m. *Id.* at 21, ¶ 65. At one point, Mr. Schaefer heard a police announcement, which he could not make out because of the noise of the crowd. *Id.*, ¶ 66.

A few minutes after joining the seated protesters, police officers encircled the group and thereafter several people dove through the circle to join the seated group. *Id.*, ¶ 67. Mr. Schaefer saw an individual approach an officer and ask if the protesters were free to leave. *Id.*, ¶ 68. The officer stated, "No," and added that the police intended to arrest everyone. *Id.*, ¶ 68. Mr. Schaefer understood that he was not free to leave and remained seated on the lawn surrounded by the police for approximately 90 minutes. *Id.*, ¶ 69.

At approximately 2:30 p.m., ACPD Officer Joseph Flageolle and John Doe arrested and detained Mr. Schaefer. *Id.* at 5-6, 21-22, ¶¶ 17, 70. Mr. Schaefer did not resist. *Id.* at 21-22, ¶ 70. Mr. Schaefer was taken to jail and held for approximately two hours. *Id.* at 22, ¶ 72. Mr. Schaefer was released from custody at about 11:00 p.m. *Id.* , ¶ 73.

Reports filed or caused to be filed by defendants, including a Statement of Probable Cause/Affidavit for Arrest Warrant, allege that Mr. Schaefer committed the offenses of trespass and disobeying a lawful order. *Id.*, ¶ 74. Three months later, the Denver City Attorney's Office asked the court to dismiss the charges because there was "no reasonable likelihood of conviction." *Id.*, ¶ 75.

**B. <u>Flanders Lorton</u>**

Plaintiff Flanders Lorton was active in organizing free speech events at the Auraria Campus. *Id.* at 23, ¶ 76. He had previously taken classes on the Auraria

Campus and had spent much time on Tivoli Quad. *Id.* Mr. Lorton was a volunteer with the Students for a Democratic Society ("SDS"). *Id.*, ¶ 77.

On April 26, 2024, Mr. Lorton arrived at Tivoli Quad at approximately noon. *Id.* at 23-24, ¶ 79. Shortly before 12:30 p.m., as he was preparing to participate in a community prayer for Muslim families, Mr. Lorton witnessed the arrival of approximately ten police cars. *Id.* As police entered the lawn, Mr. Lorton joined other protesters who stood in protest along one side of the encampment, where they later locked arms and sat down. *Id.* Mr. Lorton was not involved in setting up, camping in, or maintaining the encampment. *Id.*

Shortly after Mr. Lorton sat down on the lawn, the police began to encircle the protesters. *Id.* at 24, ¶ 81. At that point, Mr. Lorton understood that he was not free to leave. *Id.* At approximately 12:54 p.m., the police began arresting the seated protesters. *Id.*, ¶ 82. From the protesters' perspective, the police arrested the protesters starting at the right end of the line. *Id.* Mr. Lorton was at the far-right end of the line and therefore was one of the first protesters to be arrested. *Id.* The arresting officers were Officers Flageolle and defendant Corporal Joshua Bode of ACPD. *Id.* at 5, 24, ¶¶ 15, 82. As they were arresting Mr. Lorton, they told Mr. Lorton that he was being arrested for trespass. *Id.* at 24, ¶ 82.

Mr. Lorton was booked into jail and remained there until approximately 2:00 a.m. *Id.* at 25, ¶ 85. Defendants filed or caused to be filed reports, including a Statement of Probable Cause/Affidavit for Arrest, that alleged Mr. Lorton had committed the offenses of trespass and interference with a lawful order. *Id.*, ¶ 86. Six months later, the Denver

City Attorney's Office asked to the court to dismiss the charges "in the interests of justice." *Id.*, ¶ 87.

**C. <u>Josie Angel</u>**

Plaintiff Josie Angel was a 23-year-old protest organizer in Denver. *Id.*, ¶ 88. In January 2024, Mx. Angel joined the Democratic Socialists of America ("DSA") and became more active in organizing protest activities. *Id.*

On April 25, 2024, Mx. Angel spent much of the day on Tivoli Quad participating in protest activities. *Id.*, ¶ 89. Mx. Angel was not involved in establishing the encampment on Tivoli Quad and did not set up a tent or sleep on Tivoli Quad. *Id.* On April 26, 2024, upon arrival, Mx. Angel saw a line of protesters standing along one edge of the encampment and joined the protesters. *Id.* at 26, ¶ 91. The line of protesters, including Mx. Angel, sat down interlocking arms. *Id.* While in the line of protesters, Mx. Angel saw a police officer use a megaphone but could not make out what was being said. *Id.*, ¶ 92. Mx. Angel sat in the line for about 45 minutes at which point the police surrounded the protesters. *Id.* Mx. Angel understood that they were not free to leave. *Id.*

At approximately 1:46 p.m., Corporal Bode and defendant Sergeant Eric Martinez of the ACPD arrested Mx. Angel. *Id.* at 5, 26, ¶¶ 15, 16, 93. While arresting Mx. Angel, one of the officers told Mx. Angel that they were being arrested for trespass and disobeying a lawful order. *Id.* at 26, ¶ 93. Mx. Angel was released from jail at approximately 1:30 a.m. the following morning. *Id.* at 27, ¶ 95. Reports filed or caused to be filed by Defendants, including a Statement of Probable Cause/Affidavit for Arrest Warrant, allege that Mx. Angel committed the offenses of trespass and interference with

police authority. *Id.*, ¶ 96. The Denver City Attorney's Office asked the court to dismiss the charges "in the interests of justice." *Id.*, ¶ 97.

## II. LEGAL STANDARD

### A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to

dismiss.” (quoting *Twombly*, 550 U.S. at 570)). If a complaint’s allegations are “so general that they encompass a wide swath of conduct, much of it innocent,” then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, “a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.” *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B. <u>Qualified Immunity</u>

“Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court should resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, “government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) “where a qualified immunity defense is implicated, the plaintiff ‘must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional

rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III. ANALYSIS

Plaintiffs bring the following claims pursuant to 42 U.S.C. § 1983: (1) First Amendment Violation – Freedom of Speech and Assembly; (2) First Amendment Violation – Retaliation; (3) Fourth and Fourteenth Amendment Violation – Unlawful Seizure; and (4) Fourth Amendment Violation – Malicious Prosecution. Docket No. 1 at 27-33. Defendants move to dismiss plaintiffs' complaint on the basis of qualified immunity. Docket No. 31 at 6.

### A. Claim One – First Amendment Freedom of Speech Claim

#### *1. Constitutional Violation*

The Court first considers whether plaintiffs have plausibly alleged a violation of their First Amendment right to freedom of speech. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; *see Brewer v. City of Albuquerque*, 18 F.4th 1205, 1217 (10th Cir. 2021);

*iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) ("At its core, 'the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" (quoting *Boos v. Barry*, 485 U.S. 312, 318 (1988))); *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) ("government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972))). "By incorporation through the Fourteenth Amendment, this prohibition applies to states and their political subdivisions." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 979 (10th Cir. 2020).

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Swanson v. Griffin*, 2022 WL 570079, at *3 (10th Cir. Feb. 25, 2022) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)). In traditional public forums, such as sidewalks and streets, a content-based regulation of speech must meet strict scrutiny, while a content-neutral regulation, by contrast, must meet intermediate scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A designated public forum is property the government has opened for expressive activity, treating the property as if it were a traditional public forum." *Summum v. Callaghan*, 130 F.3d 906, 914 (10th Cir. 1997). While a government is not required to indefinitely retain the "open character" of a designated public form, "as long as the property is designated as a public forum, the government is bound by the same standards as apply in a traditional public forum." *Id.* (internal quotations and citations omitted).

A content-based regulation is one that is "based upon either the content or subject matter of speech." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980); *see also Ward*, 491 U.S. at 791 (asking "whether the government has adopted a regulation of speech because of disagreement with the message it conveys"). A content-neutral regulation is one that is "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (emphasis omitted) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 43 n.15 (10th Cir. 2013) ("A policy is content neutral if its restrictions do not hinge on either the viewpoint or the subject ma[tter] of the speech."). In distinguishing between the two, "[t]he government's purpose is the controlling consideration." *Id*.

"Viewpoint discrimination is a subset – and a particularly 'egregious form' – of content discrimination." *Pahls*, 718 F.3d at 1229 (quoting *Rosenberger*, 515 U.S. at 829); *see also Taylor*, 713 F.3d at 43 n.15 ("Subject matter regulation is 'not as obnoxious as viewpoint-based regulation,' but either form of content regulation raises constitutional concerns." (quoting *Hill v. Colorado*, 530 U.S. 703, 723 (2000))); *see also Ognibene v. Parkes*, 671 F.3d 174, 192 (2d Cir. 2012) ("Viewpoint discrimination is a subset of content discrimination."). Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* "Both content- and viewpoint-based speech restrictions are presumptively invalid." *Pahls*, 718 F.3d at 1229 (citing *Ysursa v.*

*Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009)); *Rosenberger*, 515 U.S. at 830–31; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

The first step in "analyzing restrictions on private speech on government property" is to determine whether the speech at issue is protected by the First Amendment. *See Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1138 (10th Cir. 2001). There is no dispute among the parties that plaintiffs engaged in First Amendment-protected speech on April 26, 2024.

Second, the court must identify the forum at issue. *See id.* at 1138-39. A traditional public forum "is a place, like a street or a park, that has customarily remained open to the public for assembly and debate." *Spiehs v. Morgan*, 183 F.4th 1209, 1214 (10th Cir. 2026). On the other hand, a designated public forum is "government property that has not traditionally been regarded as a public forum but which is intentionally opened up for that purpose." *Id.* (citation omitted). "A designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity." *Brewer*, 18 F.4th at 1219 n.12 (citation omitted). The complaint alleges that Tivoli Quad is a lawn area on campus that has been designated as an area for "Assembly" pursuant to AHEC Policy 3.4.1. Docket No. 1 at 9-10, ¶ 28. The government has intentionally opened Tivoli Quad to the public for expressive activity pursuant to AHEC Policy 3.4.1 and therefore it is a designated public forum.

"In a designated public forum, the government can impose reasonable restrictions on the time, place, or manner of protected speech." *Spiehs*, 183 F.4th at 1215 (internal quotation and citation omitted). These restrictions are valid so long as

they are content-neutral, "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication." *See id.*

The Court first addresses whether the dispersal orders were content-based or content-neutral.[3] In his dispersal orders, Chief Mollendor did not indicate that only the protesters had to disperse, but rather ordered everyone in Tivoli Quad to disperse. *See Fuller v. Salt Lake City*, 775 F. Supp. 3d 1212, 1222 (D. Utah 2025) ("On their faces, the curfew orders directly regulated conduct, not speech. And the regulated conduct was far from necessarily expressive: the orders generally barred people from being outside in public areas at certain hours, whether or not they were engaged in speech protected by the First Amendment."). The dispersal orders were content-neutral because they ordered everyone to leave the area, regardless of whether such person was engaged in speech and regardless of any speech's content. *See id*.

Even if a restriction "is facially neutral as to the content, the restriction may be content-based if the purpose is discriminatory." *Spiehs*, 183 F.4th at 1215. Plaintiffs argue that the dispersal orders had a discriminatory purpose because Chief Mollendor "made clear that this dispersal order was chiefly, if not exclusively, aimed at the protesters speaking out against Israel's genocide in Gaza." Docket No. 48 at 8. In support, plaintiffs point to the allegations that Chief Mollendor, in his broadcast to ACPD officers, stated that "[t]his is now an unlawful protest"; an officer referred to the protester with a bullhorn as an "agitators"; subordinate officers were instructed to arrest the legal observers last; and that all the arrested protesters were protesting in support of Palestine. *Id.* at 8-9. The fact that the dispersal orders only affected the protesters

[3] Plaintiffs do not claim that the Camping Policy is content based.

does not make it content-based, and there are no allegations that other protesters were present on April 26, 2024. *See Spiehs*, 183 F.4th at 1216 ("The Supreme Court has also regarded restrictions on *protesting* and *demonstrating* as content-neutral."); *Meyers v. City of New York*, 812 F. App'x 11, 15 (2d Cir. 2020) (unpublished) ("the [dispersal] order was content neutral; just because protesters were the only ones impacted does not change that fact"); *Clark*, 468 U.S. at 294 (the fact that conduct "may be expressive and part of the message delivered by the demonstration does not make the ban any less a limitation on the manner of demonstrating, for reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid"). Furthermore, there are no allegations in the complaint that suggest the content of plaintiffs' speech, being in support of Palestine, motivated the dispersal orders.

In sum, the Court finds that the dispersal orders were facially content-neutral, and plaintiffs do not plausibly allege facts that would otherwise render the dispersal orders content-based regulations.

Next, the Court considers whether the dispersal orders were narrowly tailored. Content-neutral regulations "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (citation omitted). A restriction is "narrowly tailored if it promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Spiehs*, 183 F.4th at 1222 (internal quotation and citation omitted). A "restriction may be narrowly tailored even when other alternatives would be less burdensome." *Id.*

Defendants argue that "AHEC has significant interests in clearing the Quad of an overnight encampment that violates campus policy, in ensuring public and campus safety, conserving against substantial property damage, and in protecting against hygiene concerns that are associated with such encampments." Docket No. 31 at 16. It may be logical that, even though the tents had only been in Tivoli Quad a short time, AHEC had concerns about hygiene and wanted to clear the Quad, not to disrupt a protest, but rather to inspect and clean the area. But, not only is the complaint devoid of such allegations, but defendants cite no evidentiary support for this theory, whether or not the Court could properly take such evidence into account.

Even if the Court could consider defendants' asserted purpose for why AHEC needed to clear Tivoli Quad, the complaint contains allegations demonstrating that the dispersal orders were not narrowly tailored to enforce the Camping Policy and to clear the Tivoli Quad of the tents. Chief Mollendor told Z Williams several times that everyone would have to leave campus, not just Tivoli Quad, pursuant to the dispersal orders. *See* Docket No. 1 at 13-14, ¶¶ 43, 45, 48. Chief Mollendor informed Z Williams that the protesters could not move to the sidewalk, but rather had to leave the campus. *Id.* at 13, ¶ 43. Even when the protesters were lined up along one side of the encampment and appeared to block access from that side, the police had access to the encampment from other sides. *Id.* at 16-18, ¶ 56. The complaint plausibly alleges that it was unnecessary to remove the protesters from campus in order to take down the tents. The Court also finds that the dispersal orders did not leave open alternative channels of communication. The dispersal orders did not indicate any other way in

which people could continue their protest and instead directed that everyone leave the campus.

Because the dispersal orders were not narrowly tailored, the Court finds that plaintiffs have plausibly alleged a violation of their First Amendment right to freedom of speech and assembly.

***2. Clearly Established Law***

Defendants contend that, given the Camping Policy, the issue of qualified immunity turns on "whether it was 'clearly established' on April 26, 2024, that campus police could not use a blanket dispersal order to enforce a valid and preexisting time, place, and manner restriction." *See* Docket No. 51 at 3-4. Plaintiffs do not contest that the dispersal orders were based upon the Camping Policy. *See* Docket No. 48 at 7.

It was clearly established in April 2024 that a government cannot restrict free speech in a designated public forum if that restriction is not narrowly tailored. In *McCullen v. Coakley*, 573 U.S. 464, 469-470 (2014), the Court considered the constitutionality of a Massachusetts statute that established buffer zones outside facilities offering abortions. Although the Massachusetts statute was content neutral and had a valid interest in ensuring public safety outside of abortion clinics, *McCullen* held that the statute was not narrowly tailored to serve this interest because it "impose[d] serious burdens" on the petitioners' First Amendment right to engage with women approaching these facilities. *See id.* at 487-90. The Tenth Circuit in *Verlo v. Martinez*, 820 F.3d 1113, 1131 (10th Cir. 2016), similarly noted that "even content-neutral restrictions on speech in a public forum – whether a traditional public forum or a designated public forum – must be narrowly tailored to advance a significant

government interest." *Verlo* acknowledged the significant governmental interest in public safety but held, relying on *McCullen*, that an administrative order's "total ban on expressive activity" was not narrowly tailored to the government's interest in ensuring public safety and reducing congestion near a courthouse. *Id.* at 1137.

Although Chief Mollendor understood that a small group of protesters had violated the Camping Policy and had refused to leave Tivoli Quad, it was clearly established that enforcement of a lawful time, place, and manner restriction could not sweep up other protesters who were obviously not violating such restrictions. Here, rather than focusing on the tents and attempting to identify those occupying them, Chief Mollendor issued a blanket order affecting all persons on Tivoli Quad. Such an order was not narrowly tailored. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."). For example, in *Fogarty v. Gallegos*, 523 F.3d 1147, 1158 (10th Cir. 2008), a case involving an anti-war protest in Albuquerque, the court held that:

> The defendants' arguments that the police had probable cause to arrest Fogarty rest only on characterizations of the protest in general, and not on evidence of Fogarty's individual action. The Fourth Amendment plainly requires probable cause to arrest Fogarty as an individual, not as a member of a large basket containing a few bad eggs. In other words, that Fogarty was a participant in an antiwar protest where some individuals may have broken the law is not enough to justify his arrest.

Defendants cite *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022 (10th Cir. 2015), for the proposition that, "[i]n this type of evolving, multi-suspect scenario, qualified immunity is appropriate, because the law is not clearly established." Docket

No. 31 at 27. *Callahan* addressed "whether the law was clearly established that an officer could not arrest an entire small group when he knows some unidentifiable members, if not all members, of that group have committed a crime." *Callahan*, 806 F.3d at 1028. In concluding that the law in that area was not clearly established, *Callahan* relied on cases in which a small number of possible suspects were present in a confined space and where the police had difficulty distinguishing suspects from those uninvolved in the crime. *Callahan* discusses *Maryland v. Pringle*, 540 U.S. 366, 368 (2003), a case where a police officer pulled over a car that had three occupants. *See id.* at 1028-29. The driver consented to a search of the vehicle that revealed a large amount of money and bags of cocaine. *See id.* When none of the three occupants claimed the drugs, the officer arrested all three occupants. *See id.* *Pringle* held that probable cause supported the arrests. *See id.* at 1029. *Callahan* cited *Pringle* for the following principle:

> The officer in *Pringle* knew a crime had been committed but could not identify the perpetrator. He was presented with three suspects, none of whom were independently suspected prior to the stop. Evidence of a "common enterprise" existed, and so the officer could reasonably infer that all present were involved in the crime.

*Id.* at 1029. *Callahan* involved arrests that were made during an investigation into thefts thought to be committed by officers with the Kansas City police department's SCORE unit. *See id.* at 1024-25. The investigating officers set up a sting operation and observed a SCORE officer commit theft, but that officer could not be identified due to the protective gear the SCORE officers were wearing. *See id.* at 1025. The investigating officers therefore arrested all members of the SCORE unit. *See id.* *Callahan* found that the Supreme Court's holding in *Pringle* raised questions about the

law in multi-suspect situations and held that the investigating officers were entitled to qualified immunity.

*Callahan* is distinguishable and does not alter the conclusion that it was clearly established that a content-neutral restriction on speech must be narrowly tailored. The complaint here plausibly alleges that only a small group of protesters had violated the Camping Policy, none of which were plaintiffs, and that Mr. Spear had spoken to some of these protesters. Docket No. 1 at 10-11, ¶¶ 31-33. Thus, the protesters violating the Camping Policy were capable of being identified. Mr. Spear told these protesters that, as long as they did not camp overnight on the Auraria Campus, they were free to continue their protest. *See id.* at 11, ¶ 33. Rather than removing the identifiable group of protesters who had violated the Camping Policy or limiting the dispersal orders to just those persons, the dispersal orders directed everyone on Tivoli Quad to leave. *Callahan*, by contrast, involved only six people who could not be distinguished from each other for purposes of identifying the person observed on camera stealing. 806 F.3d at 1025. It also involved a small house. *Id.* The Court finds that *Callahan* is not instructive on the issue of clearly established law here. The Court concludes that Chief Mollendor violated clearly established law in issuing the dispersal orders and is not entitled to qualified immunity.

The Court will next consider whether defendants who arrested plaintiffs – Corporal Bode, Sergeant Martinez, Officer Flageolle, and the John Doe officer – are entitled to qualified immunity. The complaint alleges that Chief Mollendor issued a radio transmission stating, "Chief to all units, this group has refused to acknowledge our legal counsel's request to leave. This is now an unlawful protest." Docket No. 1 at 12, ¶ 38.

Chief Mollendor's dispersal orders stated that "[t]his assembly is in violation of DRMC 38-115 Trespass" and that people on Tivoli Quad had fifteen minutes to leave the area. *Id*. at 13, ¶ 44.

The Court finds that that the arresting officers did not violate clearly established constitutional rights of which a "reasonable person would have known." *See Harlow*, 457 U.S. at 818. Based on the information from Chief Mollendor, the arresting officers had reason to believe that Mr. Spear told people on Tivoli Quad to leave, they refused to do so, and as such they were in violation of Den. Rev. Mun. Code § 38-115 unless they left the area. Plaintiffs cite a line of cases that purportedly "has long made clear that police cannot break up peaceful protests in public fora simply because a person in their midst has violated the law." *See* Docket No. 48 at 13. The cases cited by plaintiffs, however, do not show that it was clearly established that an arresting officer had to question the underlying validity of the dispersal orders. *See Bidwell v. Cnty. of San Diego*, 607 F. Supp. 3d 1084, 1099 (S.D. Cal. 2022), *aff'd,* 2023 WL 7381462 (9th Cir. Nov. 8, 2023) ("Plaintiffs cite no case showing that it is clearly established law the individual arresting officers were required to make an 'individualized inquiry' as to whether the underlying dispersal order was lawful before arresting persons for refusing that order."). Moreover, public universities are permitted to revoke consent and issue citations for trespassing. *See, e.g.*, *Wilson v. Wichita State Univ.*, 662 F. App'x 626, 629 (10th Cir. 2016) (unpublished) ("Generally, universities have discretion to exclude otherwise constitutionally protected activities from their campuses, provided that the activities violate reasonable rules or substantially interfere with educating students."); *see also Dames v. Roberts*, 818 F. Supp. 3d 725, 752 (M.D.N.C. 2026) (finding that a

university has "authority to remove individuals from its campus who violate either the law or its policies"). Thus, the nature of the dispersal orders themselves did not alert the arresting officers of the invalidity of the orders.

Accordingly, the Court will grant qualified immunity to the arresting officers as to Claim One.[4]

**B. <u>Claim Three –Unlawful Seizure</u>**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. A "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007). An arrest requires probable cause to believe that the arrestee committed a crime. *Cortez v. McCauley*, 478 F.3d 1108, 115-16 (10th Cir. 2007) (en banc).

"In a qualified immunity context, the probable cause evaluation is a question of law appropriate for resolution by the Court." *Shimomura v. Carlson*, 17 F. Supp. 3d 1120, 1132 (D. Colo. 2014) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). When determining whether an officer has probable cause for an arrest, the court must

---

[4] Plaintiffs argue that the Supreme Court has long held that police must be faced with a clear and present danger in order to restrict protest activity. *See* Docket No. 48 at 13. However, the clear and present danger test does not apply where there is a valid time, place, and manner regulation. *See Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 437 (6th Cir. 2009) ("The plaintiffs also complain that the district court refused to instruct the jury that a prior restraint can be justified only by a 'clear and present danger.' But because this was a reasonable time, place and manner regulation, not a prior restraint, the premise of this argument does not exist."); *In re Lazy Acres Farm, Inc.*, 134 F.3d 371, 1997 WL 809968, *6 (6th Cir. 1997) ("the 'clear and present danger' test is generally understood to apply only to content-based speech restrictions") (citation omitted).

"examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (internal quotation marks and citation omitted). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). It is not a "high bar" for a court to find that an officer had probable cause. *Wesby*, 583 U.S. at 57 (citation omitted). Rather, the existence of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. (citation omitted).

#### *1. Constitutional Violation*

Mr. Schaefer was charged with trespass and disobeying a lawful order, Docket No. 1 at 22, ¶ 74; Mr. Lorton was charged with trespass and interference with a lawful order, *id.* at 25, ¶ 86; and Mx. Angel was charged with trespass and interference with police authority. *Id.* at 27, ¶ 96.

The Court first considers whether there was probable cause to arrest Mr. Lorton and Mx. Angel for interference with police authority, pursuant to Den. Rev. Mun. Code § 38-31(a), which provides:

> It shall be unlawful for any person, in any way, to interfere with or hinder any police officer, any member of the police department, or any person duly empowered with police authority, while such officer, member, or person duly empowered with police authority is discharging or apparently discharging their duties.

Den. Rev. Mun. Code § 38-31(a).[5] The complaint alleges that, as Mr. Lorton witnessed the arrival of the police to Tivoli Quad, he joined the protesters by locking arms with them and sitting down. Docket No. 1 at 23, ¶ 79. Mr. Lorton was arrested while linking arms with the seated protesters. *Id*. at 24, ¶ 82. Similarly, Mx. Angel joined the seated protesters and linked arms with them and was arrested alongside these other protesters. *Id.* at 26, ¶ 91. The Court finds that these allegations support probable cause for violating § 38-31(a). Mr. Lorton and Mx. Angel linked arms with other protesters, thus hindering law enforcements' efforts to arrest them. Because there was probable cause for their arrest, Mr. Lorton and Mx. Angel's Fourth Amendment and First Amendment retaliation claims fail.

Mr. Schaefer, however, was not arrested for interference with police authority, but rather for trespass and failure to obey a lawful order. Docket No. 1 at 22, ¶ 74. The charge of failure to obey is codified at Denver Municipal Code § 38-31(c), which states that it is

> unlawful for any person to fail to obey a lawful order of a police officer if such failure interferes with or hinders such police officer in the discharge of his official duties. It is an affirmative defense to this subsection that the failure to obey did not interfere with or hinder the police officers.

Den. Rev. Mun. Code § 38-31(c). The order at issue is Chief Mollendor's dispersal order:

> I am Chief Mollendor of the Auraria Campus Police Department. This assembly is in violation of DRMC 38-115 Trespass. You must disperse. Failure to disperse will subject each of you to arrest and prosecution. If you remain, reasonable and necessary force may be used to remove you. The following are routes of dispersal for you to peacefully leave the area: East on Larimer St, North

[5] Den. Rev. Mun. Code § 38-31(a) was modified in August 2026. The Court relies on the version of the statute that was in effect during the events alleged in the complaint.

> on 11th Street or West on Walnut Street. You have 15 minutes to leave the area. The time is 12:30.

*See* Docket No. 1 at 13, ¶ 44. At this stage, as discussed above, plaintiffs have plausibly alleged that the dispersal orders were unlawful because they violated plaintiffs' First Amendment rights. Therefore, plaintiffs have sufficiently alleged that there was no probable cause to arrest Mr. Schaefer for failure to obey a lawful order in violation of § 38-31(c) given that there was no lawful order.

Turning to Mr. Schaefer's trespassing charge, § 38-115(a) of the Denver Municipal Code states that it is:

> unlawful for any person knowingly to enter or remain upon the premises of another when consent to enter or remain is absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof.

Den. Rev. Mun. Code § 38-115(a). A "government official may not base her probable cause determination on an unjustifiable standard, such as speech protected by the First Amendment." *Mink v. Knox*, 613 F.3d 995, 1003-04 (10th Cir. 2010) (internal quotation and citation omitted). Consistent with the Court's finding that plaintiffs have sufficiently alleged a violation of their First Amendment rights, the Court finds that plaintiffs have sufficiently alleged that the dispersal orders were unlawful restrictions of speech. Thus, Mr. Schaefer's refusal to obey the unlawful dispersal orders and plaintiffs continuing to exercise their First Amendment rights cannot be the basis for defendants' probable cause finding that Mr. Schaefer was trespassing. Accordingly, Mr. Schaefer has plausibly alleged a violation of his Fourth Amendment rights as he was arrested without probable cause.

Because there was probable cause for Mx. Angel's and Mr. Lorton's arrests, they fail to allege a violation of their Fourth Amendment rights. Accordingly, defendants are

entitled to qualified immunity on Claim Three as brought by Mx. Angel and Mr. Lorton. However, Mr. Schaefer has plausibly alleged a violation of his Fourth Amendment rights because he was arrested without probable cause.

### ***2. Clearly Established Law***

To determine whether the law was clearly established in the context of Mr. Schaefer's Fourth Amendment claim, a court considers whether there was arguable probable cause for his arrest. *See Detreville v. Gurevich,* 2025 WL 1874587, at *6 (10th Cir. July 8, 2025); *Mglej v. Gardner*, 974 F.3d 1151, 1164 (10th Cir. 2020). "Arguable probable cause" is another way of saying that the officers' conclusions about whether probable cause existed rested on a reasonable but mistaken belief. *Cortez v. McCauley*, 478 F.3d 1108, 1120-21(10th Cir. 2007); *see also Jordan v. Jenkins*, 73 F.4th 1162, 1170 (10th Cir. 2023). The "protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Deutsch v. Jordan*, 618 F.3d 1093, 1098 (10th Cir. 2010) (quoting *Pearson*, 555 U.S. at 231); *see also Mocek v. City of Albuquerque,* 813 F.3d 912, 922 (10th Cir. 2015); *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 n.3 (10th Cir. 2014) (although "an officer's mistake of law cannot serve as a basis for probable cause," the second prong of the qualified immunity analysis "protects officials from civil liability for mistakes of law if reasonably made").

As noted earlier, a "government official may not base [his] probable cause determination on an unjustifiable standard, such as speech protected by the First Amendment." *See Mink*, 613 F.3d at 1003-04 (internal quotations and citation omitted). Because a "reasonable person" in his position would have known that the dispersal

orders were unlawful restrictions of speech, as discussed regarding Claim One, Chief Mollendor could not base his probable cause determination on Mr. Schaefer's failure to obey the dispersal orders. *See Harlow*, 457 U.S. at 818. Accordingly, the Court will deny qualified immunity for Chief Mollendor on Claim Three as brought by Mr. Schaefer.

Turning to the arresting officers, "a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998) (internal quotations and citation omitted). Here, Chief Mollendor told the arresting officers that the group at Tivoli Quad "refused to acknowledge . . . legal counsel's request to leave" such that the protest is "unlawful." Docket No. 1 at 12, ¶ 38. Furthermore, Chief Mollendor's dispersal orders told the arresting officers that the group at Tivoli Quad were violating Den. Rev. Mun. Code § 38-115 and had fifteen minutes to leave the area. *See id.* at 13, ¶ 44. Thus, the arresting officers had arguable probable cause to believe that the individuals on Tivoli Quad remained on the premises despite "consent to enter or remain" being "absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof." *See* Den. Rev. Mun. Code § 38-115(a). As a result, the arresting officers had arguable probable cause to believe that the dispersal orders were lawful.

The next question is whether the arresting officers had arguable probable cause to believe that Mr. Schaefer was part of the group that refused to obey the dispersal order. Chief Mollendor issued several dispersal orders, which occurred at 12:30 p.m., 12:36 p.m., 12:41 p.m., and 12:46 p.m. *Id.* at 13, 15, ¶¶ 44, 52. Mr.

Schaefer was present for the 12:46 p.m. dispersal order because he arrived at 12:43 p.m. *Id.* at 20-21, ¶ 64. Furthermore, Mr. Schaefer heard the dispersal order, even if he could not make out was being said. *Id.* at 21, ¶ 66. Mr. Schaefer also joined the seated protesters after the announcement was made. *Id.*, ¶ 67.

Thus, Mr. Schaefer was present for at least one of the dispersal orders and took actions contrary to the order by sitting down or refusing to leave. There are no factual allegations showing that the arresting officers should have understood that Mr. Schaefer did not hear the dispersal orders. Perceiving these facts would "lead a prudent person to believe" that Mr. Schaefer had failed to obey the lawful dispersal orders. *See York*, 523 F.3d at 1210. Mr. Schaefer fails to plausibly allege that the arresting officers lacked arguable probable cause for his arrest for failure to obey a lawful order in violation of § 38-31(c) and for trespassing in violation of § 38-115. The arresting officers are therefore entitled to qualified immunity on Claim Three as brought by Mr. Schaefer.

### C. <u>Claim Two – First Amendment Retaliation</u>

Generally, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks and citation omitted). To establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) he was engaged in a constitutionally protected activity; (2) the defendant's action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's actions were substantially motivated as a response to plaintiff's exercise of his First Amendment speech rights. *Becker v. Kroll*, 494 F.3d 904,

925 (10th Cir. 2007). Ordinarily, a plaintiff must plead and prove the absence of probable cause for the arrest. *Id*.

The Court starts by addressing the third element concerning animus. To establish the third element, a plaintiff must show that the defendant's action was "substantially motivated" in response to his exercise of First Amendment speech rights. *Becker*, 494 F.3d at 925. The Supreme Court has held that the retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 399.

As discussed regarding Claim Three, the Court has found that there was probable cause to arrest Mx. Angel and Mr. Lorton for interference with police authority. Defendants argue that the absence of probable cause means that plaintiffs fail to plausibly allege animus. *See* Docket No. 31 at 20. Plaintiffs argue that they do not need to allege a lack of probable cause in support of their First Amendment retaliation claim because they were selectively arrested. *See* Docket No. 48 at 20-22. "A retaliatory-arrest plaintiff need not show a lack of probable cause if he can show that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Frey*, 41 F.4th at 1234 (internal quotation and citation omitted). Specifically, plaintiffs argue that they were selectively arrested due to their sitting and linking arms. *See* Docket No. 48 at 21. As discussed above, it was plaintiffs sitting and linking arms that provided probable cause for their arrest for interference with police authority. The fact that linking arms and sitting are also forms of "expression" does not mean they cannot form the basis for probable cause so long as the fact such actions were expressive was not the reason for the arrest. *See Meyers*,

812 F. App'x at 15 ("the [dispersal] order was content neutral; just because protesters were the only ones impacted does not change that fact"); *Clark*, 468 U.S. at 294 (the fact that conduct "may be expressive and part of the message delivered by the demonstration does not make the ban any less a limitation on the manner of demonstrating, for reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid").

Plaintiffs also argue that defendants did not arrest counter-protesters who demonstrated support for Israel. *See* Docket No. 48 at 21-22. The only allegation in support of this argument is that, at some time in April 2024, "[o]thers gathered to counter-protest, expressing approval of Israeli military actions." Docket No. 1 at 8-9, ¶ 25. There are no allegations showing that these counter-protests occurred on April 26, 2024 or that these counter-protesters participated in similar conduct, namely, sitting and linking arms as they were about to be arrested.

Accordingly, the Court finds that Mx. Angel and Mr. Lorton fail to plausibly allege a First Amendment retaliation claim and defendants are therefore entitled to qualified immunity on Claim Two as brought by Mx. Angel and Mr. Lorton. As discussed regarding Claim Three, the arresting officers had arguable probable cause for Mr. Schaefer's arrest and therefore his First Amendment retaliation claim against the arresting officers fails as well. *See Rael v. Calkins*, No. 20-cv-02250-CMA-MEH, 2022 WL 218621, at *9 (D. Colo. Jan. 25, 2022) ("Plaintiff's First Amendment retaliation claim fails because [defendant] had arguable probable cause to arrest him.).

While Chief Mollendor lacked arguable probable cause to order Mr. Schaefer's arrest for failure to obey the dispersal orders and trespassing, defendants argue that

plaintiffs nevertheless fail to allege retaliatory animus because there are no well-pleaded facts to support the conclusory allegations that he “acted with animus to the content of the protesters’ pro-Gaza message.” Docket No. 31 at 29. Plaintiffs respond that they have “[pled] several facts showing that Defendants were motivated by Plaintiffs’ protected expression.” Docket No. 48 at 22. In support, plaintiffs cite their allegations that a DPD officer characterized the protester with the bullhorn as the “main agitator.” *Id.*; Docket No. 1 at 15, ¶ 50. The Court finds that this allegation – involving a statement by an unidentified DPD officer, who is not a defendant, concerning a protester, who is not a plaintiff – does not make it plausible that Chief Mollendor acted with retaliatory animus toward plaintiffs. Moreover, the DPD officer’s comment was based on the fact that the protester was using a bullhorn; there are no allegations demonstrating that his comment was focused on the content of the protester’s speech. Plaintiffs also cite allegations relating to Chief Mollendor’s decision to issue the dispersal orders to everyone at Tivoli Quad rather than just those individuals violating the Camping Policy. *See* Docket No. 48 at 22; Docket No. 1 at 13, 16-19, ¶¶ 43, 56-57. While these allegations are indicative of a First Amendment restriction that was not narrowly tailored, as discussed regarding Claim One, it does not make it plausible that Chief Mollendor’s dispersal orders were based on retaliatory animus. There are no allegations that plausibly allege that Chief Mollendor’s conduct was “substantially motivated” in response to the exercise of the protesters’ First Amendment rights to protest in support of Palestine. *See Becker*, 494 F.3d at 925.

Accordingly, the Court finds that defendants are entitled to qualified immunity on Claim Two.

### D. <u>Claim Four – Malicious Prosecution Claim</u>

"A malicious prosecution claim brought under the Fourth Amendment requires a showing that (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014) (internal quotation and citation omitted).

For a malicious prosecution claim, "the precise question is not whether probable cause supported [plainitff's] original arrest but whether probable cause supported her subsequent continued confinement and prosecution." *Sodaro v. City & Cnty. of Denver*, 753 F. Supp. 3d 1224, 1236 (D. Colo. 2024). Thus, the Court must consider the probable cause analysis in the context of plaintiffs' allegation that defendants "caused the wrongful initiation and continuation of criminal proceedings against Plaintiffs." *See* Docket No. 1 at 32, ¶ 138.

The complaint is devoid of allegations that address the probable cause supporting plaintiffs' continued confinement and prosecution. The complaint merely alleges that "Defendants caused the wrongful initiation and continuation of criminal proceedings against Plaintiffs. Defendants knew or should have known that the charges underlying those proceedings were unsupported by probable cause to believe any Plaintiff had committed a crime." *Id.* Similarly, the complaint asserts without factual support that there was "no good-faith basis" for the Statement of Probable Cause/Affidavit for Arrest Warrant. *Id.* at 22, 25, 27, ¶¶ 74, 86, 96.

For purposes of a malicious prosecution claim, "[p]robable cause is measured by considering whether, without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [plaintiff's] continued confinement or prosecution." *See Bledsoe v. Carreno*, 53 F.4th 589, 614-15 (10th Cir. 2022) (internal quotation and citation omitted). For instance, "a plaintiff can challenge the institution of legal process as wrongful when arrested without a warrant by challenging the probable cause determination made during the constitutionally-required probable cause hearing." *See Detreville,* 2025 WL 1874587, at *7 (internal quotations and citation omitted). Without any allegations addressing the probable cause, or lack thereof, supporting plaintiffs' charges post-arrest, plaintiffs cannot carry their burden to show that no probable cause supported defendants' continued confinement and prosecution of plaintiffs. Because plaintiffs have not plausibly alleged a violation of their Fourth Amendment rights to be free from malicious prosecution, defendants are entitled to qualified immunity on Claim Four.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that Defendants' Motion to Dismiss [Docket No. 31] is **GRANTED in part and DENIED in part**. It is further

**ORDERED** that plaintiffs' claims against Joshua Bode, Eric Martinez, Joseph Flageolle, and John Doe are **DISMISSED with prejudice**.[6] It is further

[6] The Court dismisses with prejudice those claims for which defendants are entitled to qualified immunity. *See Clark v. Wilson,* 625 F.3d 686, 692 (10th Cir. 2010) (instructing the district court to grant defendants' motion to dismiss based on qualified immunity "with prejudice"); *McCrary v. Jones*, 2015 WL 873641, at *6 (W.D. Okla. Feb.

**ORDERED** that Claims Two and Four are **DISMISSED with prejudice**. It is further

**ORDERED** that the portion of Claim Three asserted by plaintiffs Flanders Lorton and Josie Angel are **DISMISSED with prejudice**. It is further

**ORDERED** that defendants Joshua Bode, Eric Martinez, Joseph Flageolle, and John Doe are terminated from this case.[7]

DATED September 29, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge

27, 2015) (dismissing claim with prejudice where defendant was entitled to qualified immunity).

[7] Claim One as brought by plaintiffs against Chief Mollendor and Claim Three as brought by Mr. Schaefer against Chief Mollendor will proceed.